The defendant denied the allegation of negligence, and alleged that the intestate of the plaintiff was guilty of contributory negligence.
On the trial P. G. Wilson testified as follows: "In morning deceased and another boy passed me going up towards railroad. They got up on culvert arch and sat down and commenced whistling — sat there half an hour and then went up higher and laid down on embankment; could see boys, deceased from his knees up, and he was on embankment on the west side of the road so I couldn't tell where his feet were; knees must have been on the stringer which ran along the ties. This stringer was the guard rail running across the trestle and ran 12 to 14 inches from the iron; trestle had been filled up, making the earth on either side of track higher than track, sloping toward track on one side and down on other. They lay on this dirt with their feet towards track. Heard train blow at Magnolia; heard train blow at crossing three hundred yards from them. I rushed towards them calling out, but didn't rouse them. They lay still, as if asleep. No bell was rung before they were (618) struck; train passed three or four hundred yards before it took up; was going very rapidly. Deceased was one of these boys. His mouth was bruised, one of his feet cut off either above or below the knee, his clothes were torn, his body bruised, and he was dead. He didn't move at all before train struck him." Witness had noticed them still this way for some time before train came and thought all the time they would get up, and finally went to them. "It was a passenger train of two cars and locomotive, known as Shoo Fly train. At point where they were killed there was a straight track from Magnolia on one side of trestle to Rose Hill on the other, straight line for five miles. There was straight track from boys towards train for two miles and a half, and way was open. The earth where they were lying was yellow dirt and gravel. The train approached bodies on a down grade. It is a pretty smart grade and cut all the way from Magnolia to trestle."
Cross-examined: "Accident occurred half-past eight in morning in May. Train came along about regular schedule time; and they had been in habit of seeing train — would ride on it a little way, then jump off. They sat on the arch of the culvert a while and then went higher up embankment. Both laid down on their stomachs — one with face on arm, one with his face up road and one down. This earth on either *Page 427 
side was higher than track, and at points there was a little depression. This point was just over the trestle, and I can't say whether there was any depression at that point. Crossing three hundred yards from accident. It was a fair day."
W.F. Pickett testified: "Man on engine could have seen anything the size of a small pig on the railroad for half a mile from direction whence train came. I saw place where boy was day before and day after, and this was its condition: Earth was a little higher than track (619) on either side, where it had been dumped in filling trestle, but not much, not more than an inch or so, and there was no depression or hollow large enough to hide a man; it was nearly level; the whole embankment wasn't more than three feet."
Miss Annie Wilson testified: "Was in sight of place where boys were killed. I was down in the field; they were there when we went down to field, and they remained still on track in same place till train ran past. No bell or signal given by train to arouse them. It had blowed once several hundred yards back. We could just see the heads of boys; one was lying on face with his arm under his head; don't recollect how other was lying didn't see them move at all didn't see them at exact time train struck them; some bushes were then between us and boys. Boys had been on track half to three-quarters hour before train come."
Captain Johnson testified for the defendant: "I am road master and superintendent of track of defendant road between Wilmington and Wilson; lived in Magnolia five years and have been superintendent of this division since March, 1888, and have been in railroad service for 24 years; was on train day boys were killed. It had been a trestle and had been filled up under my supervision; filled with common material leaving 16 feet wide at top, sloping one to one, and had hauled sand alongside for purpose of taking out trestle timbers. This sand was shoveled off flat on either side guard rail as high as two and a half feet in some places and others not more than one. There were depressed places — irregular — when two cars came end to end there would be very little dirt, and here it would be low — at point where blood was where boys were killed, and they were lying in one of the low places. The place where they were lying was ten inches lower than usual height. I was on a lever car the next day after the accident and (620) standing on seat and approached place as train came, and height was perhaps a foot lower than engineer; approached 275 feet before seeing a hand lying in this place; couldn't then tell it was a man; when cross-tie put up to iron couldn't tell 275 feet; when it was put off iron could see it 275 feet. Last load of earth was put there Saturday before accident; gravel came up ten inches above the hole where body was *Page 428 
lying; down grade from Magnolia to this trestle, and is twenty-four feet to mile. It's steep and so considered." He knows boy very well; knew him all the time when witness lived in Magnolia. "I was Mayor last three years; never saw him work any except on street under sentence for jumping on train. Train had a large class engine and brakes, two cars. Train could have been stopped in 300 yards and not sooner. The crossing was not a public crossing."
John Neimeyer: "Have been an engineer since 1854; was engineer on this train; were running 45 or 50 miles an hour, and 125 yards from place first saw sign of anything on track; thought it was a cross-tie. In fifty yards saw it was was a human being; one foot on track; did everything to stop train but could only do so in 200 yards beyond bodies; was thirty or forty yards from body before saw it was a man's foot; body was in depression; knees on guard rail and foot only out on track. I thought it was an old tie some one had dragged up there. Depression in dirt hid them. They were not exposed to view. They were in one of these depressions and lying flat on their stomachs. The grade was twenty-five or thirty feet to mile. Had a big, heavy engine and two cars. At that speed on that grade could not have possibly (621) stopped it under 300 yards. Harder to stop a light train with air brakes or a train with a few cars than a larger number. I pointed place to Captain Galloway and Captain Johnson. It is not dangerous to run over a man, but is to run over cross-ties. Brakes were in good working order."
Cross-examined: "Three hundred yards is shortest time train could have been stopped. In saying ran 200 yards beyond bodies I only estimated. The schedule running time was forty miles an hour, including stops; was five minutes late and was running faster to make the next stop on schedule time. I was keeping careful lookout, but at speed of train and the engine vibrating couldn't distinguish an object till nearly on it. The body was in one of these depressions and track was not obstructed. I was noticing centre of track. I might have seen a white object three or four hundred yards, but not in the declivity, which obstructed view. I am 63 years old."
Redirect: "I was running at regular speed and under regulations of the company. Have to stop at every station, and it required all speed to make time."
L. G. Wilson testified: "Am a farmer, live near track and have ridden on trains and think I have sufficient knowledge to give an opinion as to what distance required to stop a train. I don't know the effect or power of air-brake appliances." Defendant proposed to ask the witness as expert what distance it would have required to stop this train. Court *Page 429 
decided he was no expert, disallowed question, and defendant excepted.
His Honor submitted to the jury the following issues, which with the responses were as follows:
"1. Is the plaintiff, Wm. F. Pickett, the duly qualified administrator of Albert J. Williams, deceased?" Answer: "Yes."
"2. Was the said Albert J. Williams killed by the negligence of the defendant company?" Answer: "Yes."
"3. Did the said Albert J. Williams by his own negligence (622) contribute to his death?" Answer: "No."
"4. What damages is the plaintiff entitled to recover?" Answer: "Nine hundred dollars."
The following requests for instructions were asked by the defendant in writing and in apt time:
"1. If the jury believes that the deceased went upon the road of the defendant company and laid down upon it for the purpose of going to sleep, and did go to sleep upon it in such a position that a part of his body was upon the track, and while so asleep was run over and killed by the cars of the defendant, the defendant would not be liable unless the engineer actually saw the deceased in time to avoid the injury.
"2. That if the jury believe that the intestate of the plaintiff was tired and sleepy, and being conscious of this fact, went upon the roadbed of defendant and laid down with a part of his body upon the track, and while in this position was unexpectedly overcome by sleep and was killed by the defendant's train, the defendant would not be guilty of negligence, and the jury should so find, unless the jury believe further that the engineer of the defendant actually saw the intestate of the plaintiff in time to stop.
"3. That in determining whether the engineer of the defendant saw the plaintiff's intestate or could have seen him in time to avoid the injury, it is the duty of the jury to consider the duties imposed upon the engineer and the circumstances surrounding him. That it is their duty to consider the fact that he owed a duty to the passengers upon the train and had to care for his engine, and that he was upon a rapidly moving train.
"4. That if the jury believe that the engineer of the defendant saw an object on the track in time to avoid the injury, but could not discover that it was a person, and they believe further that, after (623) discovering that it was a person, the engineer could not stop in time to avoid the injury, the defendant would not be guilty of negligence.
"5. That if the jury believe that the engineer of the defendant could have seen an object on the track in time to avoid the injury, but not in time to discover that it was a person, and they believe further that, *Page 430 
after he could have discovered that it was a person, the engineer could not have stopped in time to avoid the injury, the defendant would not be guilty of negligence.
"6. That the plaintiff is entitled to recover nothing of the defendant on account of pain, grief or mental suffering, and nothing as a punishment to the defendant.
"7. That the measure of damages is the present value of the gross income of the plaintiff's intestate less the cost of living and his expenditures, that is, his net income, and these damages could not exceed what the jury believe to be the present value of the accumulations to the estate of the plaintiff, based upon the expectancy of life."
These instructions were refused, except as they are contained in the charge of the court hereinafter set out, and defendant excepted.
His Honor charged the jury as follows:
The court explained to the jury the nature of the action and the defenses relied upon, making four issues for their decision, and charged the jury on the first issue, to which there was no exception.
On second issue, with other matters not excepted to, the court charged the jury: That ordinarily negligence was some breach of duty which one person owed another, causing damage. That their inquiry in (624) second issue would be as to what duty the defendant company owed the plaintiff's intestate, and whether there had been a breach of that duty which caused the death of the intestate. That an engineer's first duty was to care for the safety of his passengers on his train, to give every necessary attention to matters in and about his engine, and also to keep a lookout for things on the track or so near it as likely to become an obstruction to his train. That, as to persons in or upon the track, if they were adult and awake, he had a right to suppose that such persons would use their faculties for their own safety and get out of the way, and in such case the engineer had a right to act on that supposition and continue the speed of his train, but if persons are on the track, down and helpless — giving every indication of being asleep and unconscious — then it is the duty of the engineer to take note of their presence, if he sees them or could do so in the exercise of due care, and if the engineer could see persons in such a condition on the track ahead of his train, and by keeping a proper lookout, in the exercise of due care, could have observed them far enough off to stop his train, his duty was to regard their presence and stop his train, if necessary for their safety, and if he failed in this duty and thus caused the death of the persons, he has been guilty of a breach of duty, and his company would be responsible. And, in this present case, if the intestate was down upon the track helpless and giving every indication of *Page 431 
being asleep and unconscious, and he was so placed that the engineer by keeping a proper outlook and in exercise of due care could have observed him, and that it was a person upon the track, for 500 or 1,000 yards — far enough off to have gotten his train under control — in this case if they believed the evidence, such distance being 300 yards and more, it was the engineer's duty to have seen the intestate and stopped his train, if necessary for his safety, and if he failed to do so under such circumstances and thereby caused the death of the intestate, the engineer was guilty of negligence, and the jury should answer the second (625) issue "Yes."
If, however, the intestate was lying in such a position and was so placed as to prevent the engineer from seeing that a person was upon the track until he got so close to him he could not get his train under control, and because it was so placed the engineer failed to see it in time, then the killing would be an accident. The defendant company would not be responsible, and the jury should answer the second issue "No."
The court here explained the nature of the ground, grade, etc., stated the evidence tending to show that a trestle had been filled up nearly to a level with ordinary earth preparatory to taking out timbers, which had been hauled and placed on either side of track, higher than track and uneven in surface, making depressions, etc.; the evidence tending to show the body was out and exposed and that tending to show it was hidden in one of these depressions, etc., and told the jury it was for them to determine from the evidence whether the body was so placed that the engineer could have seen it was a person down and helpless in time to have stopped his train or whether it was so that the engineer could not have seen it in 270 feet or 125 yards, too late to have gotten his train under control. The court further charged on this issue that the burden was on the plaintiff to make good the allegation and issue by the greater weight of evidence. The law presumed that persons did their duty, and required a person who charged a breach of duty to establish it by proof. That if the evidence satisfied them by the greater weight that there had been a breach of duty by engineer causing the death of intestate, issue should be answered "Yes." If not, they should answer the issue "No." And if the minds of the (626) jury were left in doubt about the matter, if they were unable to determine from the evidence how it was, they should answer the issue "No." because the burden of this issue was on the plaintiff.
On the third issue the court charged the jury that if the intestate voluntarily went upon the track and there carelessly and negligently went to sleep and, being unconscious and asleep, was run over and *Page 432 
killed by the defendant's train, and he could have been seen and observed by the engineer of the defendant company and was negligently run over and killed by the defendant's train, as explained in the second issue, then the jury should answer the third issue "No." That the negligent act of the intestate in going upon the track was remote in point of time and not the proximate and concurrent cause of the injury, and so not contributory.
On the fourth issue the court charged the jury that the measure of damages was the reasonable expectation of pecuniary benefit from the continued life of the deceased to those who would have been dependent upon him had he continued to live out his natural life. That the tables in The Code which had been offered were evidence on the question of probable duration of the life of the deceased and, taking his age at 17, if accepted, would make such duration between 44 and 45 years (44 2-10), and the damage would be the net moneyed value of the intestate's life to those dependent upon him had he continued to live out his appointed time. That on this question the jury should consider the strength of the intestate, his habits, capacity and disposition to work. The court here recited the evidence for plaintiff and the defendant on these matters and told the jury to consider the evidence and the suggestions and arguments which had been made and award what in their judgment would be a fair and just (627) compensation for the pecuniary injury done by the death of the intestate.
The defendant excepted to the charge upon the second issue as follows:
"1. For that his Honor charged the jury that it was the duty of the engineer to keep a lookout for things so near the track as likely to become an obstruction to his train, upon the ground that, while true as an abstract principle of law, it is a duty to the passengers on the train, and not applicable to this case.
"2. For that his Honor, in view of the evidence, placed the nonliability of the defendant upon the fact that the intestate was lying in a depression in the ground, whereas the defendant contended that the intestate could not have been seen in time to avoid the accident, although not lying in a depression.
"3. For that his Honor assumed throughout the charge that the intestate was upon the track, whereas there was evidence to the contrary.
"4. For that his Honor substantially expressed the opinion that 270 feet or 125 yards is the distance within which it was too late to stop. the train, whereas the evidence was to the contrary, and his Honor had not the legal right to express an opinion as to the fact." *Page 433 
The defendant excepted to the charge of his Honor upon the third issue as follows:
"1. For that it was equivalent to telling the jury that if they answered the second issue `Yes,' and believed the evidence they should answer the third issue `No.'
"2. For that he instructed the jury that the negligent act of the intestate in going upon the track and falling asleep there was remote and not the proximate and concurrent cause of the injury, and not contributory."
The defendant expected to the charge on the fourth issue as follows:
"1. For that his Honor told the jury that the damages would be the net money value of the intestate's life, etc., whereas he ought to have told them that it was the present value of the net moneyed (628) value of the intestate's life, etc.
"2. For that his Honor told the jury to award what in their judgment would be a fair and just compensation for the pecuniary injury due by the death of the intestate, leaving the whole matter to the discretion of the jury."
There was a verdict for plaintiff, and from the judgment thereon defendant appealed.
The most important question presented by the appeal is whether the court erred in refusing to instruct the jury that if the plaintiff's intestate deliberately laid down upon the track and either carelessly or intentionally fell asleep there, the defendant was not liable unless the engineer actually saw that he was lying there in time, by the reasonable use of appliances at his command, to have stopped the train before it reached him. In the headnote to Smith v.R. R., 114 N.C. 729, it seems that the intelligent reporter deduced from the opinion of the Court the principle that while the mere going upon the track of a railroad is not contributory negligence, any injury subsequently inflicted by a collision with a passing train is deemed to be due to the carelessness of the person who goes upon it, unless it is shown that he looked and listened for its approach. While such an abstract proposition may be fairly drawn from the reasoning upon which the opinion is founded, the new trial was in fact awarded because the court below refused to instruct (629) the jury that if the plaintiff's intestate was drunk, though he *Page 434 
was lying apparently helpless upon the track, the defendant was not liable unless its engineer actually saw that he was in danger in time to avert the injury by reasonable care.
The learned counsel who argued this case for the defendant, without citing Smith's case in support of his contention, obviously invoked the aid of the principle there decided when he rested his argument upon the proposition that one who carelessly or purposely falls asleep on a railway track is not only negligent in exposing himself upon first going there, but that, though he afterwards becomes utterly unconscious, there is, in contemplation of law, a continuing carelessness on his part up to the moment of a collision, which is, concurrently with the fault of the defendant, a proximate cause of an ensuing injury, or operates to quit the carrier of what would have been culpable carelessness and a causa causans
if the injury had been inflicted on a horse, a pig, a cow, or person rendered insensible in any manner than by drunkenness or deliberately or carelessly falling asleep. So that we are again called upon to reviewSmith's case and to determine whether we will modify the principle there laid down or extend its operation to other cases coming within the reason upon which it is founded.
The language of Judge Cooley, which is cited in Clark v. R.R.,107 N.C. p. 449, is: "If the original wrong only becomes injurious in consequence of the intervention of the distinct wrongful act or omission by another, the injury will be imputed to the last wrong which was the proximate cause, and not to that which was more remote." If in the case at bar the plaintiff's intestate was in fault in lying (630) down upon the track and his carelessness culminated in doing so, then it is clear that the engineer was in fault in failing to keep a proper lookout, if he could by doing so have seen the deceased in time through the reasonable use of the appliances at his command to have averted the injury, and his carelessness of course intervened after that of plaintiff's intestate. If he had looked and stopped the train the collision would have been prevented notwithstanding the previous want of care on the part of the boy who was killed. In Herring v. R. R., 32 N.C. 402, this Court followed what was at the time the generally accepted doctrine that persons who went upon railroad tracks at places other than public crossings were trespassers, to whom the carrier owed no duty of watchfulness and for whose safety it was in no wise liable unless its engineer actually saw that there was danger of injury from a collision and wilfully refused to use means by which he could have averted it.
In Gunter v. Wicker, 85 N.C. 310, this Court gave its sanction to the principle first distinctly formulated in Davies v. Mann, 10 M. *Page 435 
W. (Ex.) 545, that "Notwithstanding the previous negligence of the plaintiff, if at the time the injury was done it might have been avoided by the exercise of reasonable care and prudence on the part of the defendant, an action will lie for damages." This doctrine was subsequently approved in Saulter v. Steamship Co., 88 N.C. 123;Turrentine v. R. R., 92 N.C. 638; Meredith v. Iron Co., 99 N.C. 576;Roberts v. R. R., 88 N.C. 560; Farmer v. R. R., ib., 564;Bullock v. R. R., 105 N.C. 180; Wilson v. R. R., 90 N.C. 69; Snowdenv. R. R., 95 N.C. 93; Carlton v. R.R., 104 N.C. 365; Randall v.R. R., 104 N.C. 108, and it was repeatedly declared in those cases that it was negligence on the part of the engineer of a railway company to fail to exercise reasonable care in keeping a lookout (631) not only for stock and obstructions, but for apparently helpless or infirm human beings on the track, and that the failure to do so, supervening after the negligence of another, where persons or animals were exposed to danger, would be deemed the proximate cause of any resulting injury.
It was after all of these precedents following Gunter v. Wicker, supra, that the Court in Deans v. R. R., 107 N.C. 686; was confronted with the question whether a railway company was liable where by ordinary care its engineer could have stopped his train in time to prevent its running over a man lying asleep upon its track, under the doctrine of Gunther v. Wicker, or whether, the accident having occurred at a place other than a public crossing, the company could be held answerable, under the rule as stated inHerring v. R. R., only where it was shown that the engineer actually saw the trespasser and had reasonable ground to comprehend his condition. Upon mature consideration the Court overruled Herring's case and stated the rule applicable in such cases to be: "If the engineer discover or by reasonable watchfulness may discover a person lying on the track asleep or drunk, or see a human being who is known by him to be insane, or otherwise insensible to danger or unable to avoid it, upon the track in his front, it is his duty to resolve all doubts in favor of the preservation of human life and immediately use every available means, short of imperiling the lives of passengers on his train, to stop it." This rule was approved in express terms in Meredith v. R. R., 108 N.C. 616; Hinkle v. R. R., 109 N.C. 472;Clark v. R. R., 109 N.C. 444 and 445; Norwood v. R. R., 111 N.C. 236;Cawfield v. R. R., 111 N.C. 597.
In Smith's case, supra, the same questions were again presented, and this Court was asked to overrule the doctrine of Deans v.R. R., and reinstate Herring v. R. R., as authority. The Court (632) *Page 436 
declined to overrule Deans' case and others which had followed it, but held that, in so far as the opinions purported to bring within the protection of the rule a person who is lying upon the track in an insensible state brought about by drunkenness, they were entitled only to the weight of dicta. No member of the Court adopted this particular view but the Chief Justice, who delivered the leading opinion. The other members of the Court were either in favor of sustaining without any modification or of overruling in toto the principles as enunciated in Deans' case. The learned counsel for the defendant now contend that one who deliberately incurs the risk of lying down upon the track is no more entitled to the protection of the law than a drunken person, and that where he is killed his personal representative cannot invoke the benefit of the rule which subserves the purpose of shielding even brutes from the same unnecessary peril. At common law in England the owner of cattle was required to keep them in or restrain them from trespassing on the lands of others. 2 Shearman Red. Neg., secs. 418, 626, 627. But in this country the rule has been either modified by statute or in a much larger number of states entirely disregarded, because the reason upon which it was founded, under different conditions, had ceased to operate. 2 Shearman Red. Neg., secs. 419 to 422. The principle deduced from Davies v. Mann, 10 M. W., 545, as is said by discriminating law writers, is that "The party who has the last clear opportunity of avoiding the accident, notwithstanding the negligence of his opponent, is considered solely responsible for it." 2 Shearman Red. Neg., p. 165. This rule has now been adopted in almost all of the Southern and Western States, but it has been construed in some of them and by a number of text writers as applying to injuries done by moving trains only where the engineer (633) actually sees an animal or a person. But this Court, soon after adopting the rule laid down in Davies v. Mann (inGunter v. Wicker, supra), construed it in its application to animals inWilson v. R. R., 90 N.C. 69, followed by Snowden's, Carlton's, Bullock's,and Randall's cases, supra, to mean that an engineer was not only negligent in failing to avert an injury to animals actually seen, but those which might by proper vigilance have been seen by him in time, by the use of the appliances at his command and without peril to the safety of persons on the train, to avert the accident.
It is settled irrevocably in North Carolina that a railway company is answerable in damages for an injury to any valuable domestic animal, due to the failure of the engineer to exercise reasonable care in observing the track in his front, and to passengers on a train, when caused by want of a similar vigilance on the part of the same servant *Page 437 
in keeping an outlook for obstructions. The question presented in this case, therefore, as in Smith's case, is whether, by any sort of legal fiction, we can hold a servant faultless for failure to see one who has voluntarily fallen upon the track and yielded to the influence of sleep, or who, overcome with drunkenness, lies prostrate in the way of a train, when either or both are sandwiched between obstructions; animals, children or persons unconscious from sickness, or known by the engineer to be deaf, whom the law declares it is his duty to see, if it is possible for him by the exercise of ordinary care to do so. The opinion of the Court in Smith's case not only concedes, but adduces much authority to sustain the correctness of the ruling in Deans v.R. R. and the later opinions approving it, as therein interpreted, but proceeds upon the idea that in so far as any previous opinion had stated that a railway company owed the duty of watchfulness (634) to drunken persons lying on its track, or became liable for failure to discharge it, unless actually seen by the engineer, they were dicta only. It was true, however, as to Deans' and Clark's cases, that there was some evidence tending to show that in the one instance the person who fell asleep on the track was drunk and in the other that the man killed was intoxicated when he went upon the trestle.
To illustrate the operation of the conflicting rules as they now stand: suppose that the engineer is approaching a straight cut, through which he can see for one-fourth of a mile, or for a sufficient distance to stop his train without breach of his duty to those on it before reaching the cut, and that at the entrance nearest him a sleeping child, ten feet further a cow, and ten feet further still a large boulder with a drunken man, or one who deliberately laid down, resting asleep and unconscious upon it, are arranged successively. Suppose, then, that the engineer carelessly fails to look out and see the sleeping child, the cow or the boulder, and by successive collisions kills the child, the cow and the man on the boulder, and the train is wrecked by striking the boulder, so that a number of passengers are likewise killed. The result would present a legal paradox under the law as it now stands. The servant who now represents the company would render it liable for his omission of duty of keeping a lookout, for which the company could be mulcted in damages by the personal representatives of the child and of the passengers and by the owner of the cow, and yet, though the engineer could not discharge the duty, which never ceased, of watching for the boulder without seeing the drunkard or the sleeping man, the failure to see either is, in contemplation of law, no culpable breach of duty. The learned counsel for the defendant has given, it seems to us, quite as cogent reasons for holding that a railroad company *Page 438 
(635) is absolved from duty to one who wilfully or carelessly exposes himself to peril by sleeping upon a track as to one who falls down in a state of utter unconsciousness superinduced by drinking, and cited equally as strong and numerous authorities in support of his contention. But the reasons and the authorities relied upon emanate generally from courts which hold that both persons and animals upon a track are trespassers and entitled to consideration only where actually seen in time to save them. It is not strange that courts, where it is held that railway companies owe no duty to anyone who goes on their track and is not seen, should have sought support for their position, where a drunken man happened to be the victim of carelessness, in the theory that he was deemed to be still concurring up to the time of the accident and was less deserving of consideration than a sober trespasser. But it must not be forgotten that in the last analysis, notwithstanding the additional reason assigned, the drunkard, in the States holding to the principle that we have repudiated, is excluded from the right to recover because he is a trespasser, just as his sober neighbor would be barred of the right if he were injured by his side, and when actually seen the same duty of protection arises as to both.
The admitted test rule to which we have adverted, that he who has the last clear chance, notwithstanding the negligence of the adverse party, is considered solely responsible, must be applied in contemplation of the law which prescribes and fixes their relative duties. The law, as settled by two lines of authorities here, imposes upon the engineer of a moving train the duty of reasonable care in observing the track, and if by reason of his omission to look out for cows, horses and hogs he fails to see a drunken man or a reckless boy asleep on the track, it cannot be denied that he is guilty of a dereliction of (636) duty. If he is guilty of a breach of duty we cannot controvert the propositions which necessarily follow from the admission that but for such omission, or if he had taken advantage of the last clear opportunity to perform a duty imposed by law, the train would have been stopped and a life saved. It cannot be denied that in a number of the States which have adopted the doctrine of Davies v. Mann, 10 M. W., 545, it has also been held that both man and beast were trespassers when they went upon a railway track, and except at public crossings or in towns it was not the duty of the engineer to exercise care in looking to his front with a view to the protection of either. Where the law does not impose the duty of watchfulness it follows that the failure to watch is not an omission of duty intervening between the negligence of the plaintiff in exposing *Page 439 
himself and the accident, unless he be actually seen in time to avert it. The negligence of the corporation grows out of omission of a legal duty, and there can be no omission where there is no duty prescribed. But when this Court declared it the duty of an engineer to exercise reasonable care in looking out for animals on the track, it became equally a duty as to all those classes of persons who, if actually seen by him, would be entitled to demand that he use all the means at his command to avert injury to them.
Where the rule prevails that no liability attaches for a failure of the engineer to keep a lookout except in towns and at crossings, the same test is applied by the courts. So soon as the duty arises the failure to perform it, if intervening after the negligence of a person in exposing himself to peril, is held to be the last clear opportunity to discharge it, and therefore the proximate cause of the injury, if it could have been averted by the use of the means at his command after the law required him to have seen it. As we hold that the duty on the part of the engineer of watchfulness to protect life (637) is an ever-present one, attending him everywhere, and extending to the people in the remote country as well as in the towns, it necessarily follows that the opportunities that grow out of duty performed are coextensive with the duty prescribed and may arise wherever it exists. We are of the opinion that, when by the exercise of ordinary care an engineer can see that a human being is lying apparently helpless from any cause on the track in front of his engine, in time to stop the train by the use of the appliances at his command and without peril to the safety of persons on the train, the company is liable for any injury resulting from his failure to perform his duty. If it is the settled law of North Carolina (as we have shown) that it is the duty of an engineer on a moving train to maintain a reasonably vigilant outlook along the track in his front, then the failure to do so is an omission of a legal duty. If by the performance of that duty an accident might have been averted, notwithstanding the previous negligence of another, then, under the doctrine of Davies v. Mann
and Gunter v. Wicker, the breach of duty was the proximate cause of any injury growing out of such accident, and where it is a proximate cause the company is liable to respond in damages. Having adopted the principle that one whose duty it is to see does see, we must follow it to its logical results. The court committed no error of which the defendant could justly complain in stating the general rule which we have been discussing.
Considered in connection with other portions of the charge, the statement of the distances as proved by defendant's witnesses was but *Page 440 
a fair submission of the view argued by defendant's counsel, and affords no ground for exception. Under the general principle laid down inEmry v. R. R., 102 N.C. 246, and the numerous cases which have followed it, it was within the sound discretion of the court to (638) frame the issues, and the defendant must show that the exercise of that discretion operated to his injury if he would assign it as error. But in Scott v. R. R., 96 N.C. 428 and Denmark v. R. R.,107 N.C. 189, and other cases, it has been declared that the Judge was clothed with discretion to submit one, two or three issues where the controversy hinges upon a controverted allegation of negligence, as he might think best, provided he should give appropriate instructions. Where the first issue (here the second) raises not only the question whether the defendant was negligent, but also whether it was the proximate cause, the Judge is at liberty to tell the jury that if they should find that the defendant was negligent and its negligence was the proximate cause of the injury, it was immaterial to determine whether or not the plaintiff had been previously negligent.
The question propounded to the witness Wilson was intended to elicit an opinion, which it was the province of the court to decide that he had not qualified himself to give. S. v. Hinson, 103 N.C. 374.
The court below was requested, however, in substance, to instruct the jury that the measure of damage for the loss of human life was the present value of the net income, which would be ascertained by deducting the cost of living and expenditures from the gross income, and that the jury could not allow more than the present value of accumulation arising from such net income based upon the expectancy of life. The court, in lieu of the instruction asked, told the jury that the measure of damage was the reasonable expectation of pecuniary benefit from the continued life of the deceased to those who would have been dependent on him, had he continued to live out his natural life; that the expectation of one 17 years old would be 44 2-10 (639) years, and the damage would be the net moneyed value of intestate's life to those dependent upon him, had he continued to live out his appointed time. Though the court stated the abstract proposition, as we find it formulated in the books, in the first clause of that portion of the charge relating to damages, we think that the substitution of the subsequent portion of it for the more specific instruction to which the defendant was entitled and for which he asked was erroneous. The instruction given, viewed without reference to the prayer of the defendant, was objectionable in that it left the question of the date which should be the basis of the final calculation, to say the least, uncertain, if his language was not susceptible of the construction that *Page 441 
the net income would be estimated as of the period when those dependent on him would have realized the benefits of his labor had he not come to an untimely end.
We are of the opinion, therefore, that, following as a precedent Tillettv. R. R., 115 N.C. 662, a new trial should be granted for the error complained of, only as to the issue to which the erroneous instruction related. The jury found the fact upon full instruction as to the law in connection with other issues, which left the defendant no just reason to complain. But another opportunity must be given to assess the damage in the light of a more explicit statement of the law applicable. A new trial is granted, therefore, solely for the purpose of inquiring as to damages. The case will be remanded to the end that the jury may ascertain what is the present value of intestate's life.
Partial new trial.
Cited: Sherrill v. Tel. Co., ante, 361; Doster v. R. R., post, 663;Chesson v. Lumber Co., 118 N.C. 68; Lloyd v. R. R., ib., 1011; Baker v.R. R., ib., 1019; Nathan v. R. R., ib., 1070; Little v. R. R., ib., 1076;Styles v. R. R., ib., 1088; Pharr v. R. R., 119 N.C. 756; Mayes v. R. R.,ib., 769; McCracken v. Smathers, ib., 619; Fulp v. R. R., 120 N.C. 529;Coley v. Statesville, 121 N.C. 317; Purnell v. R. R., 122 N.C. 844;Williams v. Gill, ib., 968; Benton v. R. R., ib., 1009; Strother v. R. R.,123 N.C. 200; Benton v. Collins, 125 N.C. 90; Arrowood v. R. R.,126 N.C. 631; Cook v. R. R., 128 N.C. 335; Coley v. R. R., ib., 542; Bogan v. R. R., 129 N.C. 157; Jeffries v. R. R., ib., 240;Lassiter v. R. R., 133 N.C. 247; Davis v. R. R., 136 N.C. 121;Stewart v. R. R., 136 N.C. 390; Carter v. R. R., 139 N.C. 501;Plemmons v. R. R., 140 N.C. 288; Poe v. R. R., 141 N.C. 528;Sawyer v. R. R., 145 N.C. 27, 30; Smith v. R. R., ib., 103; Hawk v.Lumber Co., 149 N.C. 13; Wilkinson v. Dunbar, ib., 26;Farris v. R. R., 151 N.C. 491; Snipes v. Mfg. Co., 152 N.C. 45; Edge v.R. R., 153 N.C. 215, 216; Guilford v. R. R., 154 N.C. 608; Cabe v. R.R., 155 N.C. 411; Boney v. R. R., ib., 113; Holman v. R. R., 159 N.C. 46;Fry v. R. R., ib., 363; Speight v. R. R., 161 N.C. 86; Smith v. R.R., 162 N.C. 33; Johnson v. R. R., 163 N.C. 452, 453; Shepherd v. R.R., ib., 521; Lynch v. Mfg. Co., 167 N.C. 102; McNeill v. R. R., ib., 400; Norman v. R. R., ib., 540; Hopkins v. R. R., 170 N.C. 488; Horne v.R. R., ib., 652; Ingle v. Power Co., 172 N.C. 753 Smith v. Electric R.R., 173 N.C. 493; McManus v. R. R., 174 N.C. 737; Comer v. Winston,178 N.C. 388; Enloe v. R. R., 179 N.C. 89. *Page 442 
(640)