CHARLES S. COMER, ADMR., v. CITY OF WINSTON-SALEM.

(Filed 29 October, 1919.)

1. **Municipal Corporations — Cities and Towns — Negligence — Bridges — Guards—Children—Questions for Jury—Nonsuit—Trials.**

    A city having a bridge on its street across a stream some twenty feet below, the water rushing through a culvert with sounds to be heard on the bridge, and colored at times with many colors of dyes emptying into it from neighboring mills, ·and where the neighborhood children had been accustomed to play upon the street for many years, had provided the bridge with two parallel pipes one and one-half inches in diameter, one about eleven inches above the bridge level and the other about eighteen inches above the first, as guards, and allowed it so to remain without sufficient protection to prevent children from passing between the pipe ·guards, or falling from between them, when looking upon the many-colored water, and the stream as it dashed beneath the bridge. *Held*, such conditions, being peculiarly attractive to the children that frequented the place, afforded, in the insufficiently protected railing of the bridge, evidence of the actionable negligence of the city, in an action to recover damages for the death of the plaintiff's intestate, a 28 months old child, caused by its falling from the bridge upon its concrete foundation.

2. **Negligence — Parent and Child — Contributory Negligence — Evidence— Questions for Jury—Nonsuit—Trials—Municipal Corporations—Cities and Towns.**

    The finding of the jury that the mother of the 28 months old child was not guilty in contributing to the negligence causing the death will be upheld upon evidence tending to show that while the mother was busy about her household affairs, the deceased had gone off with her little friend, and a few minutes afterwards was killed by falling from a bridge with insufficient guard rails across a city street, near a children's playground, not far from her residence.

3. **Appeal and Error—Evidence—Municipal Corporations—Bridges—Cities and Towns—Harmless Error.**

    Where the negligence of the city caused the death of the plaintiff's intestate by permitting the guards to its bridge to remain insufficient for his protection, error, if any, in receiving testimony of a conversation of a witness with the engineer when constructing the bridge, as to danger of leaving it unguarded in that way, is harmless.

4. **Damages—Negligent Killing—Expectancy of Life—Net Worth—Negligence.**

    The measure of damages for negligently causing a death is the present pecuniary worth of the deceased, ascertained by deducting the cost of his own living and expenditures from the gross income based upon his life expectancy, his prospects in life, his habits, character, industry and skill, the means he had of making money, the business in which he was employed, so as to ascertain his reasonable net income had not death ensued, and to arrive at his pecuniary worth to his family. *Poe v. R. R.,* 141 N. C., 525, where the court read to the jury the annuity tables, cited and distinguished.

WALKER and ALLEN, JJ., dissenting.

APPEAL by defendant from *Bryson, J.,* at May Term, 1919, of FOR-SYTH.

The plaintiff's intestate, Joseph Earl Comer, was a white child, about 28 months old, whose parents were preparing to leave the city, their household effects being at the railroad station for shipment. His mother was staying with her parents in Winston-Salem preparatory to West Street; its mother was helping in the housework preparing dinner at this time; there were thirteen members of the family; the child had not been out of the sight of the mother more than twenty minutes, and just five minutes before it was killed the mother had sent her younger sister, who found the child still playing in the yard.

West Street is one of the oldest streets in Salem, and runs east and west. The first bridge or culvert across Tar Branch was built with brick walls on either side, and around this culvert the children played, for it was a gathering place for the children of the whole neighborhood. Later this culvert was built by the Southbound Railroad Company, under a contract with Salem, which was afterwards consolidated with Winston under an act by which all contracts of Winston and Salem became the contracts and liabilities of Winston-Salem. This branch carries a considerable volume of water, and where it crosses West Street it is 8 or 10 feet wide, and the base of said culvert extends about 10 feet further south than the top of the culvert. From the water at the south end of the culvert to the top is about 20 feet.

The water, in passing over this extension of the base, rushes out with considerable force, making such noise that people passing along the top of the culvert can hear the rushing of the water. Owing to the dyes poured into the stream from the mills above the bridge, the water is at of its grandmother; about 200 feet from the bridge over Tar Branch in moving.

The intestate, with a 3-year-old child, was playing horse in the yard times of many colors. As the water runs out from under the culvert it empties off of said basin into a small pool. The rippling of the water can be heard by children on the bridge, but can only be seen by them by leaning over the banisters or railing or getting through it.

The jury found that the death of the plaintiff's intestate was caused by the negligence of the defendant, as alleged in the complaint; that is, that the culvert having been constructed in one of the principal streets in said city, at a point which was used as a playground by the children in the community, the city negligently and carelessly built the banisters over said culvert so unsuitable and unsafe that a child at the age of the plaintiff's intestate could, and did get through the banister or railing to see the rushing of the colored water, which it could hear, and, child-like,

wished to see, and that by reason of such defective railing it fell and was killed. The jury further found that the plaintiff did not contribute to the injury of the intestate, and assessed the damages at $2,500.

*F. M. Parrish and Jones & Clement for plaintiff.*
*Manly, Hendren & Womble for defendant.*

CLARK, C. J. This case, in many respects, is a stronger case for plaintiff than *Starling v. Cotton Mills,* 171 N. C., 222, in which there was a reservoir near a cotton mill around which the children of the employees were in the habit of playing, and there was the protection only of a fence, which, becoming dilapidated, a child got through, and falling into the water, was drowned. The Court held, in that case, that it was the negligence of the owners of the mill that the fence was defective.

In this case the city was responsible for not maintaining an efficient railing, which would have prevented this child from getting through and falling twenty feet below upon the concrete bottom of the extension of the culvert. A small mesh, strong wire fence would have prevented such danger as this, and would have saved the life of the little one whose death was caused by leaning over the railing, or getting through it, to look at the gurgling, many-hued ripplings of the stream below.

As was well said by *Mr. Justice Walker,* in *Ferrell v. Cotton Mills,* 157 N. C., 540: "The doctrine which imputes negligence (to the parents) in such a case is repulsive to our natural instincts, and repugnant to the condition of that class of persons who have to maintain life by daily toil." Again, on page 541, he said: "If parents are negligent in permitting children to play out of doors on public ground in the day time, unattended by the parents themselves or others, then, in the majority of cases, it will be necessary to go out of the business of raising or attempting to raise children, because parents cannot be with children at all hours of the day, neither is it practical to employ others to be with them to guard against unseen dangers."

It is alleged in the complaint, and admitted in the answer, that the bridge over the culvert, with the approaches, being a part of the street, is about 40 to 45 feet long and 40 feet wide; that on each side of the culvert, for about 45 feet, till the street strikes level land at each end, there are posts several feet apart of concrete, and in these are inserted two parallel iron pipes, about an inch and a half in diameter, the lower pipe being 11 inches from the top of the culvert and the upper pipe being 17 to 18 inches above this. There was evidence that since the construction of the culvert the street at that place has been especially attractive to children, who lean over the banisters to see the water as it rushes out at the southern end of the culvert, and it was while looking at the

water, and probably by getting over, or under, the bottom pipe, that the child fell 20 feet on the cement extension and its skull was crushed, causing almost instant death, the water at the time being about 3 inches deep. The culvert is about 200 feet from plaintiff's house, and is near a number of houses in the community, it being in a residential and thickly-settled section, adjoining the playground where the children of the neighborhood were accustomed to gather.

A child cannot be kept in the house at all times, neither can it be chained, and if not allowed to play in the open, which necessarily means, in a city which is crowded, that it must play at times in the street, the children could not be raised, as light, air and exercise are absolutely necessary for their development.

There was ample evidence upon which the jury have found that the parents were not guilty of contributory negligence on this occasion. The little child went off with its little playmate to the playground of the neighborhood, where the children were known to be in the habit of gathering. It had only been gone a few moments while the busy mother was engaged in cooking dinner when the fatal accident occurred.

The plaintiff did not claim that the bridge was defective, but relied upon the fact that the authorities knew that the rippling of the water and its many-hued colors attracted the children, and that for twenty years the locality adjacent had been a playground for them, and with knowledge of the natural curiosity of children in such cases, more sufficient protection should have been placed at that point. Certainly the evidence should have been submitted to the jury upon the fair and impartial charge of the judge.

This is not even the case of an "attractive nuisance" on the property of another, which would render that other liable if not sufficiently protected. A silent turntable on the property of a railroad would not attract the attention of children as irresistibly as their irrepressible curiosity would tempt them to investigate the cause of the gurgling of the many-hued water, which rushed from under the bridge 20 feet below the point at which they would attempt to see it.

The bridge was not an attractive nuisance. It was not a nuisance at all. It was a necessary structure for the use of the city. But the noise made by the gurgling of the water would move children to wish to investigate the cause. There was no conflict of evidence that, as stated in the brief of the defendant, "for 20 years or more the children had been in the habit of playing in the vacant ground near by, and also coasting down the sidewalk on West Street, which sloped to the bridge, and also frequently played around and on the bridge." The negligence was not in the grade of the street, nor in the bridge or culvert, but in the want of sufficient protection for the children of the neighborhood frequenting that spot.

This little child was accompanied to the spot by his little playmate, who doubtless had told him of the wonders of this many-colored stream roaring out from under the bridge. Travelers in Europe go miles to see

> "The blue rushing of the arrowy Rhone" (*Byron*).

Men cross the oceans to behold the swirl of waters at Niagara, and to see a mightier river dash itself into mist at the falls of the Zambesi, and to the childish mind this many-hued, gurgling water, viewed from a heighth of 20 feet, was as sufficient to compel this trip of 200 feet.

The nonsuit was properly denied. There was evidence to go to the jury upon the issues submitted to them. The defendant objected that evidence was admitted that while the bridge was being constructed a witness had a conversation, in 1917, with the engineer supervising the work in which the witness told him that he was putting up a trap to catch children, and the engineer replied that he was instructed to build it in that manner, but thought it dangerous himself. This exception, however, and the other exceptions as to evidence in regard to the contract under which the bridge was built, might be material if there was any defect alleged in the construction of the bridge, but the ground of the complaint is that the street at this point over the trestle, with the precipice of 20 feet at a point where children were accustomed to gather, and which was especially attractive to them, required that the city should have put up a stout wire fence or other guard after the culvert was built, that would keep young children from getting through the open work railing with liability of such fatal accidents as this. The negligence is not in the construction of the bridge, but in failing to have a protection of this kind against such danger as this, and the jury found that the city was negligent in this respect. The defendant well says, in its brief: "No matter who builds a bridge in the street, the municipality is responsible for its condition and method of construction from the standpoint of safety." If, therefore, it was error to admit the evidence objected to, it was harmless error, for the condition of the street and the lack of precaution for safety of children was the negligence of the city.

The defendant also objects to the charge of the court upon the measure of damages, which seems to have been, in effect, taken from that which was approved in *Mendenhall v. R. R.,* 123 N. C., at p. 278, as follows: "The measure of damages is the present value of the net pecuniary worth of the deceased, to be ascertained by deducting the cost of his own living and expenditures from the gross income based upon his life expectancy. As a basis on which to enable the jury to make this estimate, it is competent to show, and for them to consider the age of the deceased, his prospect in life, his habits, his character, his industry and skill, the means

he had for making money, the business in which he was employed—the end of it all being to enable the jury to fix upon the net income which might be reasonably expected if death had not ensued, and thus arrive at the pecuniary worth of the deceased to his family.   You do not undertake to give the equivalent of human life.   You allow nothing for suffering."

This charge is in accordance with many other decisions.  *Benton v. R. R.,* 122 N. C., 1007; *Coley v. Statesville,* 121 N. C., 301; *Pickett v. R. R.,* 117 N. C., 616.   In *Watson v. R. R.,* 133 N. C., 191, the Court reviews these charges and approves them.

In *Poe v. R. R.,* 141 N. C., 525, on which the defendant relies, the court read to the jury the annuity table, but this was not done in the ·present instance by the judge, who simply gave them the mathematical rule prescribed in the above cases, and illustrated it to aid the jury in arriving at the present value of the loss sustained ·in the death of the plaintiff's intestate.

No error.

WALKER and ALLEN, JJ., dissenting.