Civil action to recover damages for alleged negligence that resulted in the death of plaintiff's intestate.
The material facts and assignments of error will be considered in the opinion.
This case was tried in the Superior Court of Forsyth County and plaintiff obtained a verdict and the court below set the verdict aside as being contrary to the weight of the evidence. On the next trial, at the close of all the evidence, a judgment as of nonsuit was rendered against plaintiff and an appeal was taken to this Court and the judgment was reversed. 188 N.C. 465. It was again tried, the usual issues of negligence, contributory negligence and damages were submitted *Page 15 
to the jury, and found for the plaintiff. Judgment was rendered on the verdict and the present appeal taken to this Court.
Defendants assign many errors as to the admission of evidence and the charge of the court below. The facts succinctly are:
C. P. Shelton was taking his sister to work in Winston-Salem in a five-passenger Ford automobile, about 7 o'clock a. m., on the morning of 22 November, 1922. He was driving the car and he and his sister were on the front seat — she on the right side. On the way they picked up Chas. D. Hanes, the plaintiff's intestate, a printer, on his way to work — he sat in the rear seat. The top was up, open with no curtains. They started up Salem Hill on Main Street, going north on the east side of the street, this was between Race and Mill streets. There was a line of cars all the way up the street on the east side going north, and the street car track was in the middle of the street, which was about 60 feet wide, from property line to property line. The Shelton car was following a laundry truck going north, which had slowed down and was skipping and running 8 to 10 miles an hour. About the middle of the block, C. P. Shelton attempted to pass the laundry truck and turned to go around the truck and got on the street car track, and, as he was turning back in front of the truck, there was a collision between the street car and auto, the rear door or rear left end of the Ford car coming in contact with the street car, and plaintiff's intestate was so seriously injured that he died next day about 12 o'clock.
Plaintiff's evidence tended to show that the street car was running from 20 to 25 miles an hour down grade, in the business section of the city, giving no alarm by gong or bell or otherwise, and the traffic congested with people going to work. When Shelton turned to go around the truck the street car was 60 to 75 feet away, with nothing to obstruct the view of the motorman — Shelton was going up grade, the street car was going down grade. The grade at the point of collision was 2 1/2 to 3 per cent per 100 feet.
On the other hand, the evidence for defendant tended to show that Shelton was running 20 miles an hour at the time of the collision; the street car was going at a moderate rate of speed, not over 8 miles an hour, down Salem Hill on Main Street — the grade was very slight. The Ford whipped from behind the truck and came upon the truck; immediately when Shelton came from behind the laundry truck, the motorman put on the emergency brakes, and threw the car in reverse as soon as he could, and just before it stopped the collision occurred. The bell or gong was ringing. The automobile when it collided had not slackened, but was getting faster. Shelton had passed the laundry truck 10 or 15 feet before he attempted to turn to the right to get off the street car track. That the street car had practically stopped when the Ford *Page 16 
hit it, moved about 7 feet. That the Ford car ran into the street car. The rear left end of the auto struck the front left corner of the street car. The rear wheels of the auto were broken. The collision was in the residential section.
T. R. Williard, the motorman, got out of the street car and said to Shelton: "Jerry, what in the world was you thinking about?" He said: "Williard, I don't know, I didn't see you until my sister hollered. I will take all the blame on myself. I don't blame you a bit. You made a good stop."
These are the material conflicting facts. There was evidence on both sides to sustain the facts pro and con.
The plaintiff contends: That the defendants' negligence consisted of negligently and carelessly operating its street car at the place of the collision at a dangerous and excessive rate of speed; that the defendants negligently and carelessly failed to keep a proper lookout ahead for vehicles upon said street in a dangerous and perilous position; that the defendants negligently and carelessly operated said street car down an incline or descent at an excessive rate of speed and in violation of the ordinance of the city of Winston-Salem; that the defendants carelessly and negligently operated said street car at the place of collision at an excessive rate of speed, and failed to keep a proper lookout, failed to give timely warning and failed to have said street car under proper control; and in violation of the laws of the city of Winston-Salem; that the defendants carelessly and negligently failed to provide said street car with a suitable and proper fender on the lead end of said street car, which are known and approved and in general use.
The ordinance of the city of Winston-Salem, is as follows: "Rate of speed for Street Cars — It shall be unlawful for any motorman or other person operating any street car in the city of Winston-Salem to run such car at a greater speed than is reasonable and proper, having due regard to the width, traffic and use of the street car, so as to endanger the property, or life or limb of any person:Provided, that a rate of speed in excess of fifteen miles per hour in the resident portion of the city and a rate of speed in excess of ten miles per hour in the business portion of the city, and a rate of speed upon approaching any curve, or upon a descent, in excess of six miles per hour, shall be a violation of this section."
The plaintiff contended that defendants were violating the ordinance at the time of the collision: (1) In operating a street car down a descent at a rate in excess of 6 miles an hour; (2) In excess of 10 miles an hour in the business portion of the city; (3) In excess of 15 miles an hour in the residential portion of the city; (4) That the street car was being *Page 17 
operated at a greater speed than is reasonable and proper having due regard to the width, traffic and use of the street, so as to endanger the life, limb or property of a person.
On the other hand, the defendants contended that they were guilty of no negligence whatever. That plaintiff's intestate was guilty of contributory negligence. That C. P. Shelton ran the Ford automobile into the street car, that he suddenly whipped the Ford car around the truck and got in front of the street car; that he did not keep a proper lookout, and Shelton's negligence was the sole and only proximate cause of the collision. That defendants did not violate any of the provisions of the city ordinance. That there was a slight incline and no descent in the street. That the street car was being operated in a careful manner and in a reasonable and proper way and in full compliance with the city ordinance. That the defendant's street car was equipped with a "practical" fender as required by the statute.
These were substantially the conflict of facts and law between the litigants. We will consider only the material assignments of error in the conduct of the case in the court below.
Mrs. Cornelia Hanes, the mother of plaintiff's intestate, was a witness for plaintiff. On cross-examination, over plaintiff's objection, the following questions and answers were propounded by defendants and answered by witness:
"Q. Mrs. Hanes, Mrs. Myrtle Hanes, the administratrix in this case and the widow, is living out in Indiana, in Mooseheart, Indiana, isn't she? A. Illinois.
"Q. How long has she been out there? A. Well, I kept her and the children six months after the accident until they could make arrangements to take her to Mooseheart, Illinois.
"Q. They are all living there now? A. All out there.
"Q. And they have been living there since when? A. Ever since six months after the accident.
"Q. And they were out there in March, 1924? A. Yes, sir, I suppose so. They went there in six months after his death.
"Q. So far as you know she is not married again, is she, Mrs. Hanes? A. No, sir, she is not married.
"Q. You say she stayed here for six months after the accident? A. Yes, sir, I kept her and the children and provided for them six months after his death.
"Q. They moved to what place in Illinois, did you say? A. Mooseheart, Illinois.
"Q. They have been there all the time since except one time when she came back here on a visit? She was back here on a visit one time? A. Yes, sir, she was back here on a visit but the children wasn't. *Page 18 
"Q. In fact, she hasn't been back here now in how long — a year, or longer than that? A. I don't really remember the month she left here in, but she was back here on a visit.
"Q. They all live out there and the children are in school out there? A. Yes, sir."
On redirect-examination the witness was asked the following questions, the answers to which defendants objected and exception taken:
"Q. What is the Moose Home? A. It is a home where they take the orphan children and provide for them. (Defendants objected to answer and asked that it be stricken out. The court: `Yes, sir, it is stricken out.')
"Q. Where are Mrs. Hanes' children? (Objection by counsel for defendants, overruled, exception. Mr. Womble: `May I ask the witness whether she knows or not?' The court: `I will instruct her if she knows to say, if she doesn't, she must not say.')
"Q. What is the Moose Home? A. It is where they take wives and orphans of the Moose members."
On recross-examination by defendants, the witness stated: "I was here at the former trial in the courthouse when Mrs. Myrtle Hanes was here. She is making Mooseheart her home. She has no other home to stay at."
To sustain their position, the defendants, in their able brief, say: "Section 160 of the Consolidated Statutes, which gives a right of action for a wrongful death, provides that the said action shall be brought (within one year after such death) by the `executor, administrator or collector of the decedent.'"
In Hood v. Tel. Co., 162 N.C. 71, Brown, J., speaking to the subject says: "Under the statute the only person who can sue is the personal representative of the deceased. Howell v. Comrs., 121 N.C. 362. The right conferred by statute is plainly given to the representative only. The statute confers a new right of action, which did not exist before and must be strictly followed. The parent cannot maintain it even when the statute expressly provides that the recovery shall be for his or her benefit. In such cases only the executor or administrator can sue. Killian v. R. R.,128 N.C. 263; Hood v. Tel. Co., post, 92." Hinnant v. Power Co.,189 N.C. 121. Defendants contend that this evidence was prejudicial, the pecuniary circumstances of the family, the number of children left by deceased, was calculated to incite sympathy and influence the jury. Defendants cannot complain.
It seems that the whole purpose of this examination on the part of defendants, was to show that the plaintiff in the case, Myrtle M. Hanes, although administratrix of her husband, was taking so little interest in the case that she was not attending the trial. This evidence was let in *Page 19 
over the objection of plaintiff. Defendants brought out the fact that she and the children were living at Mooseheart, Ill. The plaintiff, to break the force of this testimony, over defendants' objection, asked "What is the Moose Home?" for the purpose of showing the reason why she was not at the trial and that her indigent circumstances after the death of her husband was such as to make it necessary for her to be with her children at an orphanage. In fact defendants brought it out later that "she is making Mooseheart her home." "She has no other home to stay at."
In Ledford v. Lumber Co., 183 N.C. p. 616, it is said: "The erroneous admission of evidence on direct examination is held not to be prejudicial when it appears that, on cross-examination, the witness was asked substantially the same question and gave substantially the same answer.'Hamilton v. Lumber Co., 160 N.C. 48." Gentry v. Utilities Co., 185 N.C. 287. This assignment of error cannot be sustained.
The plaintiff's intestate was an invited guest in Shelton's Ford automobile, sitting in the rear seat, when the collision occurred.
The court below charged the jury as follows: "But, furthermore, if in any degree, however small, of the causal negligence, or that without which the injury would not have occurred, be attributable to the defendants, then the plaintiff, in the absence of any contributory negligence on the part of the plaintiff's intestate, would be entitled to recover, because the defendants cannot be excused from liability unless the total causal negligence, or proximate cause, be attributable to another or others." This charge is in the very language of White v. Realty Co., 182, N.C. 538, cited on another aspect in the present case when here before (188 N.C. p. 468); approved in Hinnant v. Power Co., 187 N.C. 295;Mangum v. R. R.,188 N.C. 696. The charge is admitted by defendants to be correct — the vice complained of was that it was repeated twice by the court below and that this was prejudicial. The court below had just prior charged the jury: "If the negligence of the owner or driver of the Ford car was the sole and only proximate cause of the plaintiff's injury, the defendant would not be liable, for in that event the defendants' negligence would not have been one of the proximate causes of the plaintiff's injury." This is repeated twice by the court below, in language (1) "I want you to get that," and repeated (2) "In other words," and repeated substantially. The court below charged favorably for defendants three times as to the "sole and only proximate cause" prior to the repeated charge above that is complained of. Matters of this kind must be, to a great extent, left to the sound discretion of the court below. We cannot hold it prejudicial or reversible error. The assignment of error cannot be sustained. *Page 20 
In the measure of damages, the court below charged the jury in the language approved in Mendenhall v. R. R., 123 N.C. 278, and other cases.Speight v. R. R., 161 N.C. 86; Ward, Admr., v. R. R., 161 N.C. 186;Lynch v. Mfg. Co., 167 N.C. 102; R. R. v. Armfield, 167 N.C. 464; Inglev. R. R., ibid., 637; Massey v. R. R., 169 N.C. 246; Gurley v. Power Co.,172 N.C. 695; Comer v. Winston-Salem, 178 N.C. 387; Purnell v. R. R.,190 N.C. 575. See, also, Carpenter v. Power Co., post, 130.
This assignment of error cannot be sustained.
The assignment of error (19) with reference to the measure of damages in a subsequent part of the charge, cannot be sustained. The charge must be construed conjunctively, as a whole, and not disjunctively, or in parts. Taken as a whole, the charge is not conflicting. S. v. Exum, 138 N.C. 599;White v. Realty Co., supra; Gentry v. Utilities Co., 185 N.C. 287;Exum v. Lynch, 188 N.C. 392; Cobia v. R. R., 188 N.C. 487; Mangum v. R.R., supra, 701.
Assignment of error was made by defendants to the following charge of the court below: "If by the greater weight of evidence you find that a proper fender would have saved the life of plaintiff's intestate, and that the car of the defendant, Southern Public Utilities Co., was not equipped with a proper fender, and that the absence of a proper fender was the proximate cause of the death of the plaintiff's intestate, then you will answer the first issue, `Yes.'" The evidence in the record in regard to the fender was: Lola Shelton, for plaintiff, testified: "The fender was an iron pipe about the size of a table with a rope netting in the middle of it."
T. R. Williard, motorman for defendant, testified: "The fender on the car was a standard fender, the regular fender used on all of the main line cars. The frame of the fender was an iron pipe, extending about three feet in front of the car, with a rope web to fill up the pen spaces and a chain from the bottom of the window up to the top of the fender to support it. The purpose of those fenders is to protect humans, children, dogs, by tripping up anything walking on the track; the fender catching it is the intention. It drops into the webbed part or basket part which is made of rope webbing. It is webbed up I guess 2 1/2 feet high. . . . The fender on the street car was made of wrought pipe, wrought iron pipe as a rim and extended about 2 1/2 or 3 feet in front of the body of the street car. That was the only metal between that and the street car. There were no wood braces of any kind between that iron rim and the street car. The iron pipe that I have just described was broken in the collision and I guess the first part of the street car that came in contact with the automobile was that fender. The fender broke *Page 21 
and then the automobile came in contact with the body of the street car. . . . I do not know how old this street car was. I had been working for the company six years at that time and it was in service then."
I. W. Worrell, conductor, testified: "The fender was made of iron pipe and rope netting the same as is used today. They had two classes of fenders, one on the main line and the other kind on the other line. The kind on the other line was a little drop fender underneath the car, doesn't come out in front of the car at all. These kinds are on the new cars. I don't know whether you would call the one on the car that had the collision the old type or not; it is like all the rest except what they call the safety cars operated by one man. I had been working for the company at that time about six years, but I can't say that this fender was in service at that time, the fenders being often changed on those cars. The best I remember, the left-end side of the fender was broken after the impact but I didn't see it when it was broken, it was down when I went around there. I couldn't say whether the fender struck the left hind wheels before any part of the body of the car struck the automobile or not; the fender was broken on that side and reached out something like three feet in front of the car. . . . Speaking about those fenders on the cars running east and west, I wouldn't call them a fender myself. I don't know what they call them. It is just a little drop under there that you touch, outside it falls down on the rail; there is nothing out in front of the car at all. The fenders on this particular car extended out in front. As to whether or not the front of the new cars forms almost a cow catcher in front of it, they may be a little different shape from the others, not much. The other cars do not go straight across; there was not any bumper on the lead end of the new cars."
This is the most serious assignment of error presented on the appeal.
C.S., 3542, in part, is as follows: "All street passenger railway companies shall use practical fenders in front of all passenger cars run by them."
In Smith v. Electric R. R., 173 N.C. 492, Clark, C.J., speaking to the subject, says: "In Powers v. R. R., 166 N.C. 599, the Court said: `This Court has always held that any act of a common carrier which is a violation of law is negligence per se.' In requiring `practical fenders' in front of all passenger cars the statute intended that they should be `efficient' for the purpose intended. . . . The motorman of a street car must be more diligent and careful for the safety of pedestrians than a locomotive engineer, for, as said recently in Ingle v. Power Co.,172 N.C. 751, the locomotive has exclusive right of way and is traveling on its own property where, as a rule, pedestrians have no right *Page 22 
to be, unless crossing a track or by recognized custom, while the street railways are using the streets to which the public have the same right."
What is the definition of "practical fender?" — practical means "fit for doing." Webster's New International Dictionary. Proper is, synonymous with fit. Webster, supra.
Fenders are for the purpose, and the evidence shows, to protect the life and limb of men, women and children; protect all classes of animals, and should be "practical" and proper to protect persons in vehicles, etc., all of whom have equal rights upon the streets, that the street car has. Moorev. R. R., 128 N.C. 458. Was the fender a practical one, fit or proper one? It failed to have proper braces, supports of sufficient strength to meet the emergency in the present case. It failed to have sufficient strength to push a 5-passenger Ford car off the track, striking it in the rear, as contended by plaintiff. Defendant did not construct the fender with braces or supports. The fender had been in service six years. We think there was sufficient evidence, more than a scintilla, to go to the jury to determine under the statute if the fender was "practical" and proper, under all the facts and circumstances of this case. This assignment of error cannot be sustained.
We have carefully examined the record and find no new or novel proposition of law in the other assignments of error, and they cannot be sustained. From a review of the entire charge by the court below, it is clear and explicit and explains the law arising on the facts. It appears that the charge followed the language and substance of the decisions of this Court on the different aspects of the law as presented by the facts. After the charge, the record shows: "The defendants have asked the court to give these contentions — which the court now does." The instructions asked for and contentions were given. The court in conclusion said: "Those are the contentions, gentlemen of the jury, of the defendants. The court endeavored to give the contentions of the parties as the trial progressed, but it is the province of counsel to put in writing the contentions and to ask that they be given. The court thinks they are proper to be given under the law and the court gives them." We think the court below was generous in giving the contentions of defendants again and in the language suggested by defendants.
The contest between the litigants was mostly one of facts in the province of the jury to determine. They have found the issues in favor of plaintiff. We find no prejudicial or reversible error in law.
No error. *Page 23