S. L. CABE, ADMINISTRATOR OF W. H. SIGMON, *v.* SOUTHERN RAILWAY COMPANY AND LON ROBERTS.

(Filed 31 May, 1911.)

1. Railroads — Negligence — Injury to Fallen Brakeman — Imputed Knowledge to Engineer—Evidence—Nonsuit.

Plaintiff's intestate, a brakeman on defendant's freight train, while going across the top of three coal cars loaded with wood, a part of the train, for the purpose of putting on the brakes, as the train was being pushed backward onto a siding, fell between the two cars nearest the engine, one of his feet catching in the rubber hose of the air brake: *Held*, a motion to nonsuit was properly allowed upon evidence tending solely to show that the train was slowly moving about at the rate of three or four miles an hour—as a man would walk; that the train stopped, as designed, in the space of a thought, or a moment or so after the brakeman fell, or after he hallooed, which was immediately thereafter; that the engineer could not have seen the intestate's peril from the engine cab; that the train could not have been stopped sooner; that neither the engineer nor a lookout at the further end of the train could have rendered timely assistance, and that the engineer did not hear him cry out.

2. Power of Court—Nonsuit.

When there is not more than a scintilla of evidence in support of plaintiff's contention, it is proper for the trial court to nonsuit him thereon.

CABE *v.* R. R.

3. Railroads — Negligence — Injury to Fallen Brakeman — Imputed
   Knowledge to Engineer—"Lookout"—Evidence—Nonsuit.

  To recover damages for the alleged wrongful killing of plain-
  tiff's intestate, a brakeman on defendant's freight train, occa-
  sioned by his falling between two cars from the top, where he was
  engaged in putting on brakes, as three coal cars loaded with wood
  were being backed upon a siding, and nearly stopped at the in-
  tended place, it was necessary in this case for plaintiff to estab-
  lish actionable negligence by showing: (1) the engineer either
  saw or had actual knowledge of intestate's peril, (2) or that he
  should have discovered it in the performance of his legal duty,
  and that he could have stopped the train in time to have avoided
  the injury. *Held*, there was no evidence upon these points suffi-
  cient to go to the jury, and that a motion to nonsuit was prop-
  erly allowed.

4. Same.

  While backing cars from a freight train onto a siding the
  engineer is required to look ahead in the direction in which he
  is moving, and though fixed with knowledge of what thus he
  should have discovered, he is not required, as a matter of law,
  to see one who has fallen between two cars onto the track and
  is endeavoring to work his way out along the sills from danger
  threatened by the slowly revolving wheels near their stopping
  place, about a car length from him; and no actionable negligence
  can be imputed to the engineer or to his company, if, under such
  circumstances, an injury is inflicted, unless he has seen the dan-
  ger and could have averted it by the exercise of reasonable care.

  Hoke, J., concurring in result; Allen, J., and Clark, C. J., dis-
senting.

  Appeal from *Councill, J.,* at the October Term, 1910, of
Buncombe.

  Civil action brought against the defendants for the alleged
negligent killing of one W. H. Sigmon. At the conclusion
of the evidence a motion to nonsuit was allowed, and plain-
tiff appealed.

  The facts are sufficiently stated in the opinion of the Court
by *Mr. Justice Brown.*

  *Craig, Martin & Thomason for plaintiff.*
  *Moore & Rollins and W. B. Rodman for defendants.*

BROWN, J.  The plaintiff brings this action against the defendant Lon Roberts to recover damages for the death of his intestate, W. H. Sigmon, attributing his death to the negligent conduct of Roberts, an engineer of defendant railway company's freight train.

Sigmon was a brakeman on the train, and on 6 May, 1908, was killed by falling between two cars.  The facts are that the engineer was backing his train of three cars from the main track onto a siding at Balsam, the engine and tender pushing the cars.  The three cars were coal cars loaded with wood.  As the train was partly on main track and turning onto the siding, Sigmon undertook to step from the second car to the one next to the tender, and fell between them.  As he fell one foot was caught in the air-hose coupler between the two cars and Sigmon was thrown on his stomach across the rail. He grasped the ends of the cross-ties with his hands and endeavored to move his body along so as to keep out of the way of the wheel, but one wheel caught his leg and severed it, from which he died.

It is admitted that if Roberts was guilty of such negligence as caused Sigmon's death the railway company is liable along with Roberts for the resultant damage.

The learned judge of the court below ruled that there was not sufficient evidence that Sigmon's death was occasioned by Roberts' negligence to require the matter to be submitted to the jury, and in that we agree with him.

We infer from the eloquent remarks of the learned counsel for plaintiff in defense of the right of trial by jury, that he feels that his client was deprived of a fundamental right by the action of the judge.

The record shows that the jury were duly impaneled and heard the case.  At its conclusion his Honor ruled that the plaintiff had failed to make out a case by proof, as he was required to do.  If his Honor was correct, then there was nothing for the jury to try.

Speaking for the Court, in *S. v. Walker,* 149 N. C., 530, *Mr. Justice Hoke* well says: "The controlling principle on a question of this character is very well stated by *Merri-*

*mon, J., in S. v. White,* 89 N. C., 464-465, as follows: 'It
is well-settled law that the court must decide what is evidence
and whether there is any evidence to be submitted to the
jury pertinent to an issue submitted to them. It is as well
settled that if there is evidence to be submitted, the jury must
decide its weight and effect. This, however, does not imply
that the court must submit a scintilla—very slight evidence;
on the contrary, it must be such as, in the judgment of the
court, would reasonably warrant the jury finding a verdict
upon the issue submitted, affirmatively or negatively, accord-
ingly as they might view it in one light or another and give
it more or less weight, or none at all.' "

This is a settled rule of law which obtains in all courts
where the practice and principles of the common law obtains,
and is quoted and affirmed by *Mr. Justice Allen* in *S. v.
Hawkins, post,* 466. This practice is conducive to the
dispatch of business and the orderly determination of liti-
gated rights, and has been crystallized into a statute, Revisal,
sec. 539, which bears the name of an eminent lawyer of this
State.

There are four grounds of negligence set out in the com-
plaint, but plaintiff rests his case upon one only, viz., that
the defendant Roberts failed to stop his train, when he knew
or should have known of Sigmon's imminent danger, and
that he could have stopped in time to have saved his life.

It was stated upon the argument that there was a man
stationed on the end of the train to keep a lookout as the
train was being backed, but it was admitted that he could
have rendered no assistance and could not possibly have
prevented the injury.

As to whether the engineer under such conditions must
also look out of his cab window when he is backing his train,
or can well do so and manage his train, it is unnecessary to
determine. This engineer admits he was looking out of the
cab window and towards the end of the train and in the
direction in which his train was moving.

The learned counsel for plaintiff admits with character-
istic candor and humanity that if the defendant Roberts had

seen the predicament of Sigmon he would have done all in his power to avert the catastrophe. But it is contended that by the exercise of due diligence the said defendant could have seen him, and that if he had seen him he could have stopped the train in time to have saved life.

All the evidence shows that when Sigmon fell Roberts could not have possibly seen the fall. He was in his cab and the tender and a car loaded high with wood was between him and Sigmon.

When Sigmon fell one foot was hung in the air-hose coupler and his stomach was on the rail and his head and hands about at end of cross-ties. He grasped the ends of the ties with his hands and endeavored by moving his body to keep the car wheel from catching him. He commenced to halloo as soon as he fell, and according to the witnesses it was about two seconds from the time he fell and commenced to halloo before one wheel ran over him and the train stopped before next wheel reached him.

The plaintiff Cabe was examined as a witness in respect to the letters of administration, but he was not present on the occasion and knew none of the circumstances.

Plaintiff introduced three witnesses who were present and saw the occurrence. Witness Bryson states that he saw Sigmon twisting the brakes when train was backing on side-track; "heard him commence hollering, and the train was then slowing up, stopping." "Train did not run over 10 feet after I heard Sigmon holler."

On cross-examination Bryson stated that he did not really know how far train moved after Sigmon commenced to halloo, but repeats his statement that train was then slowing up and very shortly stopped.

The witness was asked these questions:

Q. The train at the time of the accident was backing in on the side-track at Balsam? A. Yes.

Q. And was preparing to stop at that time? A. Yes.

Q. I will ask you if it was not only two or three seconds after the hollering until the train stopped? A. I don't know.

Q. Wasn't it an instant? A. It was all done in a short time.

Q. Almost a thought or an instant? A. Yes, something like that.

C. H. Perry saw Sigmon fall. On direct examination he states that after Sigmon fell the "train went a little piece; could not say exactly how far." Being pressed to estimate the distance, witness said "probably a car length." Upon cross-examination the witness materially qualified his estimate of the distance the train moved after Sigmon fell, as following shows:

Counsel: Q. There was a car between where Sigmon stood and the engine, loaded with wood? A. Yes.

Q. At that time you say you saw him fall down on the track, did he say anything at first or did it knock the breath out of him? A. He hollered pretty soon after he fell.

Q. Did he holler the same instant he fell or a second or two afterwards? A. Yes, a second or two afterwards, about the same time.

Q. I ask you if about the time he hollered twice, if the train did not stop—wasn't it all over in a second or two? A. It was not but a short time until the train stopped.

Q. It was only a thought or a second or two? A. Yes, he hollered a few times before the train stopped.

Q. Would you swear positively that the train moved over 8 or 10 feet or 15 feet, at the outside? A. No, sir; I did not measure it.

Mrs. C. H. Perry saw Sigmon just as he fell. His foot caught in something between cars. He fell between cars and had his hands hold of ends of cross-ties.

The following excerpt from the evidence gives Mrs. Perry's estimate of the distance train moved after Sigmon fell:

Q. How far do you think the car ran while he was trying to keep out from under the wheels? A. Not very far.

Q. What is your best judgment, a car length?

Q. You give us your best judgment?

The Court: Q. Can you give any idea about the length from any object? A. It was only a few feet between the wheels.

CABE v. R. R.

Mr. Craig: Q. What was he doing when the wheel caught him? A. He was trying to get out from under.

Q. Did he seem to be hanging to anything? A. He was just lying there trying to get out. I don't know whether he was hanging to anything or not.

Q. What was he doing; was he moving along? A. He had his hands outside ahold of the ends of cross-ties.

Q. How far did the train run after he fell before the train ran over him? A. Just a few feet; it just pushed him along a few feet and caught him.

Q. How far? A. About as far as from here to the end of the table. (Court: Witness indicating about 4 or 5 feet.)

Upon cross-examination Mrs. Perry testifies as follows:

Q. I ask you if he did not look like he was stepping from one car to the other and either slipped or fell between them? A. Yes, that was the way it looked to me.

Q. How far were the closest wheels to him when he fell on the track; was it over 2 or 3 feet? A. No, sir; I think not.

Q. And you said that when he was standing he was in the middle of the car? A. Yes.

Q. And when he fell he fell on the track? A. Yes.

Q. And the car ran immediately on his body as the train moved on? A. Yes, it was just a second or two.

Q. And it pushed his body along, before he fell, not exceeding 10 or 15 feet? A. Yes.

Q. Don't you know it was not over 8 feet? A. I don't know.

Q. You know it was done in a short distance? A. Yes.

Q. I ask you if his falling and his hollering and the stopping of the train was not all in a few seconds? A. Yes.

Q. Almost in a thought, wasn't it? A. Yes.

This is all the evidence introduced by the plaintiff of those who witnessed the occurrence.

The plaintiff's case is not aided by anything cropping out in the evidence introduced by the defendant, as an examination of the evidence plainly discloses.

J. R. Warren, witness for defendant, saw Sigmon as he fell; was 10 feet from him; he fell on his stomach across rail; his

hands caught hold ends of cross-ties; sliding along in front of wheels; one foot hung in air hose.

Q. Which rail did he fall across? A. The left-hand rail going west.

Q. That is the south rail? A. Yes.

Q. When he fell in that position, what did you hear and what did you see and what was done? A. He hollered once or twice; he did not have time to holler much; it was done in a very short time.

Q. It was all done in how long? A. In one or two seconds.

Q. One or two seconds from the time he fell until the train stopped? A. Yes.

Q. How far did the train move, how many feet, before it stopped? A. It could not have moved but a short distance.

Q. Can you given an idea of how many feet or yards, how many feet? A. I never measured it.

Q. Give us your best impression. A. It was something between 6 or 10 feet, I guess that train moved.

Q. That the train moved? A. Yes, before the train stopped.

Q. Was there a car between Sigmon at the time he fell, and the engineer? A. Yes, one car.

Q. What was that car loaded with? A. Wood.

Q. How many seconds was it from the time he fell until the train stopped? A. About two seconds.

Q. How fast was that train going? A. Three or four miles an hour; just was barely moving; it was stopping when he fell.

This witness further testifies that when Sigmon fell across the rail his head was about even with the end of the cross-ties.

D. C. Ensley saw Sigmon fall and gives substantially same account as other witnesses. He helped to pull Sigmon out after train stopped, and was asked this question:

Q. Did you make any measurements of how far it was from where he fell to where you pulled him out? A. No, sir; only we saw the print where it looked like he had been in the cinders. It was about four cross-ties.

Q. How far would that be? A. Something like 2 feet from the center to center.

Q. And you say there were four? A. Yes, we counted four.

Q. From where he fell to where you pulled him out?   A. Yes.

F. L. Potts saw the occurrence, and stated:

Q. I wish you would state to his Honor and the jury just what you saw in regard to this matter.   A. I heard him holler and I ran out a few steps and looked; I was facing the railroad and could have seen him if I had looked. And the train was just barely stopping when I saw him flounce on his stomach and his heels came over and I started towards him.

Q. From the time you heard him holler until the train stopped, how far did the train run?   A. Not over 6 feet.

Q. How many times did you hear him holler?   A. Three times—I am not certain.

Q. From the time he first hollered until the time the train stopped, how much time elapsed?   A. Not over two or three seconds.

The defendant Roberts testifies that he was backing from main track to switch at from 4 to 6 miles an hour; that he could not see Sigmon from the engine, as there was a curve from the side-track and he could not see Sigmon for that; that he was looking back from cab window in direction in which he was going; that he did not know Sigmon had fallen until train stopped; that he examined the distance and it was 6 feet from where Sigmon fell to where train stopped; that he could not have stopped his train of three loaded cars under 8 or 10 feet.

Before the plaintiff can recover or "go to the jury" in this case he must offer evidence of sufficient probative force to justify the establishment of these propositions:

1. That Roberts saw or had actual knowledge of Sigmon's peril.

As this is not contended by counsel, it may be dismissed without discussion.

2. That although Roberts had no actual knowledge of Sigmon's peril, it was his legal duty to have discovered it, and hence the law fixes him with such knowledge.

3. That after Sigmon fell between the wheels of the cars Roberts could have stopped the train in time to avoid the injury.

Upon the second proposition we have been cited to no au-

thority, and have been able to find none, which fastens upon
an engineer the duty to watch his brakemen as they move over
the train in discharge of their duties, or to discover immediately
that one has fallen between the cars.

It is manifestly impossible and inconsistent with the manage-
ment of an engine. Neither have we any authority for the
contention that it is an engineer's duty, while moving his
train backward, to look under it or along the cross-ties and in
the vicinity of the rails for persons who may have fallen be-
tween the cars.

The engineer is not required to anticipate such accidents,
and unless he actually discovers them neither reason, authority,
nor ordinary justice requires that he be held culpable if he fails
to see them.

In looking back from his cab window at the end of his train
in the direction in which it is going, the engineer may well
fail to see a person struggling under the wheels of the cars, for
he is not required to look there, or anticipate such accidents
as befell Sigmon.

And as said by this Court, "Where the law does not impose
the duty of watchfulness it follows that the failure to watch
is not an omission of duty intervening between the negligence
of plaintiff in exposing himself and the accident, unless he
actually be seen in time to avert it." *Pickett v. R. R.*, 117 N.
C., 636.

In this case there was no legal duty on the part of the engi-
neer Roberts to watch under the cars, the place where Sigmon
fell, and therefore the failure to discover him cannot be im-
puted to his negligence.

When moving his train forward it is the engineer's duty to
keep a vigilant lookout in front of him along the tracks. For
that reason he is chargeable with knowledge, not only of what
he actually sees on the track, but of what by reasonable diligence
he might have discovered. This is the principle settled by
*Bullock,* 105 N. C., 180; *Deans,* 107 N. C., 686; *Picketts, supra,*
and many other cases.

But when a train is backing, the engineer from his cab
cannot see the track ahead of his cars. Therefore the company

must place a watchman on the end of the last car so he can watch the track and guard against injuring persons in front of him. When the engineer is backing and looking in the direction in which he is moving, his vision is of course directed at the end of his train. He is looking from an elevated position far above the track rails. His purpose in looking is to note signals and as far as possible guard against any obstruction ahead of his train, and not what may be under its wheels or the end of the cross-ties.

The duties of an engineer are many and weighty and he is held to a degree of vigilance and responsibility that is placed upon no other servant of the public. But if, in addition, he is to be charged with knowledge of everything that happens on his train and under it, he would require the hundred eyes of the fabled Argus. But if perchance Roberts had been looking from his cab directly at the place where Sigmon fell, there is no reasonable proof that he could have seen him. The train was being switched from the main track to a siding at time Sigmon fell, and this formed a curve, throwing the car further out of the line of vision. All the evidence shows that Sigmon's head and hands were at the end of the cross-ties and that the cars themselves extend 14 inches beyond the rail. The plaintiff's witnesses who were on the ground heard Sigmon halloo, but did not see him until they looked for him. Roberts testifies that not only did he not see or hear Sigmon, but that he could not then have seen him from his position in the cab window.

*Edge's case,* 153 N. C., 212, is no authority for the positions advanced by the plaintiff. In that case the train was at a standstill in the switching yards. A messenger of the company approached it with the evident purpose of going between the cars. The plaintiff testifies that "he (the engineer) was looking straight at me." When plaintiff was between cars the engineer, who should have known of his perilous position, started his train and injured plaintiff.

The court thought the evidence of negligence sufficiently strong to be submitted to the jury. The great difference between that case and this is too obvious to justify discussion.

CABE *v.* R. R.

As to the third proposition, it is not contended that Roberts could have seen Sigmon as he fell between the cars, and, if he had afterwards actually discovered him struggling on the rail and between the wheels, the plaintiff's evidence falls short of showing that Roberts could have stopped his train in time to have avoided the injury.

Plaintiff's witnesses all say the train was slowing up when Sigmon fell; that it did not move over 8 or 10 feet after that. One witness said about a car length, but afterwards materially qualified that statement, as the evidence we have quoted will · show. Upon cross-examination all plaintiff's witnesses say it was "only a thought," "two or three seconds," from time Sigmon commenced to "holler" until train stopped, and that he commenced to "holler" as soon as he fell.

All the evidence shows that this train could not have been stopped, at the rate of speed it was moving, under 8 or 10 feet.

We understood it to be contended on the argument that Roberts, the engineer, testified that he could have stopped his train in 10 or 12 inches. That is erroneous. He stated he could stop *one car* in 10 or 12 inches, provided the slack was all out. There is some 2 feet slack between the cars, and as the train was backing the "slack was all in."

This train consisted of three heavy coal cars loaded with wood, and the engineer stated repeatedly it could not have been stopped under 8 or 10 feet.          ·

We have reviewed this case at some length because of its importance, and are unable to find any sufficient evidence to warrant the contention that the defendant Roberts was responsible for the injury Sigmon received or that it can be fairly attributed to Roberts' negligence.

From the evidence it appears to us to have been an accident pure and simple, and, however lamentable, no omission of duty by the defendant Roberts was the proximate cause of it.

The judgment is
Affirmed.

HOKE, J., concurring: I concur in the result. All of the testimony tends to show that the deceased fell beneath the train

from a position where his fall could not possibly have been noted by the engineer, and that he was run over in about two or three seconds from the time that he fell. All of the witnesses except one testified that the distance the train moved was from 6 to 10 feet, and that he was standing some distance off, and that the train moved about a car length, and the witness afterwards qualified this testimony by saying that he could not positively say that the train moved over 10 or 15 feet. All of the testimony tends to show further that the tender and a car loaded with wood were between the engineer and the intestate at the time he fell; that the deceased only gave a cry or two, and that if any part of his person was exposed to view at all it was only his hands about the end of the cross-ties and close to the ground, affording slight if any opportunity to either see or hear him, under any circumstances. I assume that the duty was on the engineer, in so far as consistent with proper attention to his engine, to keep an outlook over his train in the direction in which it was moving and to be properly regardful of the safety of employees upon it; but on the facts of this case, considering the point from which the deceased fell, that it could not have been observed by the engineer, the shortness of the time—not more than two seconds—the necessary attention of the engineer to the proper operation of his engine and the noise attendant upon its movement, I am of opinion that this was an excusable accident, and there is no testimony, within the definition of legal evidence, that there was a breach of duty on the part of the engineer or that an actionable wrong has been committed by the defendants.

ALLEN, J., dissenting: I do not concur in the views expressed by the Court, but the opinion has been filed so late in the term that I cannot do more than suggest my reasons for dissenting.

The opinion of the Court is based on two propositions:

1. That it was not the duty of the engineer to keep a lookout in the direction the train was backing, except for the purpose of seeing if there was any obstruction on the track in front of the rear of the train, and consequently the defendants owed no duty to the plaintiff's intestate, a brakeman, who was between the first and second cars.

2. That if such a duty should be imposed there is no evidence that, by the exercise of ordinary care, the dangerous position of the intestate could have been discovered and his death averted. If either position can be sustained, the judgment of nonsuit should be affirmed.

It is noticeable that in the first part of the opinion it is stated that it is not necessary to decide the first proposition, but after a review of a part of the evidence, it was thought best to do so.

1. The authorities agree that it is the duty of an engineer, while running his train, to keep a lookout, and that he and the company he represents are chargeable with what he sees and with all that can be discovered by the exercise of ordinary care. By the term "keeping a lookout," I understand looking in front when the train is moving forward, and to the rear when it is moving backward.

If there is any difference in the degree of care to be observed in the performance of this duty, dependent on the movement of the train, I would say that greater care should be required when moving backward, as the operation is more dangerous. I do not think that the purpose of requiring the engineer to look to the rear when it is backing is to enable him to see obstructions in front of the train, as stated in the opinion of the Court, but that it is that he may overlook the train and note the signals of the trainmen; and to do this he must observe their positions.

In this case, the train consisted of an engine, tender, and three cars, and it was backing into a siding for the purpose of leaving the cars.

J. R. Warren, a witness for the defendant, explains this:

Q. State to his Honor and the jury exactly how it occurred and all about it? A. The train comes there; it has a mountain to come up, and they were to put those cars on the sidetrack, and Mr. Sigmon was riding the car when he passed the switch, and he put on the first brake on the rear car and he jumped off by the side of me, and he jumped up between the cars and got out of my sight then, and they went down about 30 or 40 feet, and I saw him down under the car, and he rolled out in front of the wheels.

The plaintiff's intestate was setting the brakes in order that the cars might remain on the siding and in the position desired. Suppose the brakes had not held, was it not the duty of the brakeman to notify the engineer, and, if so, his duty to see?

I do not wish to see a harsh or unreasonable rule imposed on engineers, who are usually prudent, intelligent, and brave; but the position of the brakeman is a very dangerous one, and he should not be left without protection.

If this is a correct view of the relation of the parties, it was the duty of the engineer to look towards the rear of the train, that he might note its condition and might receive signals, and if he failed to look, or if he looked and failed to see what could have been seen by the exercise of ordinary care, he was negligent.

1. Did he look? I don't know, and it is not for me to say. My duty is at an end when I consider the question whether there was any evidence that he did not look. The engineer testified that he was looking west towards the rear of the train.

C. H. Perry, a witness for the plaintiff, described the fall of the deceased, his crying out, etc., and was then asked the following questions:

Q. Which way was the engineer looking when this was going on; what was standing on the other side of this train? A. There was a train pulling out just as they headed in there; pulling out towards Asheville—a freight train.

Q. What was Mr. Roberts looking at? A. He had his face turned towards the east, towards Asheville, when I noticed him.

Q. Away from this train? A. Yes.

Q. And Mr. Sigmon was which way from him? A. He was west.

It is true, he stated on cross-examination that he was not looking at the engineer the instant the deceased fell, but this witness was not a partisan of the plaintiff. It is in evidence that the defendant furnished him a pass to attend the trial, and that he notified witnesses for the defendant to attend.

Again, Mrs. C. H. Perry says:

Q. Do you know which way the engineer was looking when he fell? A. He was looking east before the accident, but I don't know which way he was looking when he was under the car.

It seems to me this is some evidence that the engineer was not keeping a lookout.

(2) But suppose he looked, did he fail to observe what a man exercising ordinary care would have discovered? There was one car and a tender between the deceased and the engineer, a distance of perhaps 60 feet. The deceased began crying out about the time he fell, and this continued until the train stopped.

C. H. Perry says:

Q. At that time you say you saw him fall down on the track, did he say anything at first, or did it knock the breath out of him? A. He hollered pretty soon after he fell.

Q. Did he holler the same instant he fell, or a second or two afterwards? A. Yes, a second or two afterwards—about the same time.

Q. I ask you if it was not a second or two after he fell that he hollered, and if his hollering and the stopping of the train was not almost at the same time? A. No, sir; the train did not stop when he fell.

Q. I mean did not the train stop almost as he hollered? A. As I recollect, the train stopped while he was hollering.

This witness was 65 or 70 yards from the train:

Q. How far were you away? A. About 65 or 70 yards.

Mrs. C. H. Perry testifies that she heard the crying out, and she was asked: "How far away were you? About 65 yards. Did you hear him holler? Yes."

F. L. Potts, a witness for defendant, said he was 60 yards from the railroad, and heard him.

Dock Bryson said he was 125 feet from the railroad, and heard him.

If two witnesses, who were 65 yards, and another 125 feet distant, heard him, is it unreasonable to say that there is evidence that the engineer, who was within 60 feet, could have

CABE *v.* R. R.

heard if he had exercised ordinary care? Next, was there evidence that he could have seen the dangerous position of the deceased?

The deceased fell between the first and second car. One of his feet became entangled at the coupling, and he fell across the rail, out between the cars. He was a grown man, and the wheels ran across his thigh. This admits of the argument that from the thigh to the head was beyond the rail, approximately 3 feet.

Mrs. C. H. Perry says:

Q. What was he doing; was he moving along? A. He had his hands outside ahold of the ends of the cross-ties.

J. R. Warren says:

Q. What position was he in when he fell between the cars? A. He fell right down on his stomach, and his hands were catching onto the ends of the cross-ties as he was sliding down in front of the wheels.

Q. Where were his feet? A. One was down next to the ties, and one was hanging somewhere, and he told me it was hung on the air hose, that his foot was hung on the air hose.

Q. What is the air hose? A. It is to connect the air between the cars; it is the rubber hose.

Q. When he fell, did he fall right across the track? A. Yes, his head was out about even with the end of the ties, about 2 feet, I guess, that is, to the end of the ties.

A. L. Roberts, the engineer, testifies:

Q. How far do those cars project over the rail? A. I don't know; something like 12 or 14 inches.

Q. So if a man's body projected out 2 feet over the rail there would not be anything in the world to prevent you from seeing him? A. It don't look like that would be.

S. L. Cabe testifies that he had worked on the railroad seven or eight years, and was acquainted with the situation at Balsam, and was asked the following questions:

Q. I wish you would state to his Honor and the jury how much of a curve there is there on this side-track? A. The main line comes up straight until you get there to the switch.

The Court: That switch was where they were putting the cars in? A. Yes, and then the main line curves south around this way.

The Court: Q. That is coming towards Asheville? A. Yes, and when the engine went up in here (indicating with motion), you could see down in there plain enough on this curve, and when you get down to the switch there is a curve there, that is, the switch curves off from the main line like any other switch.

By Counsel: Q. How much does the switch curve? A. Very little.

Q. State whether or not, at any point along there, he could have seen a man 2 feet over the track at the rear end of the car next to the engine? A. He could have seen him at any point. And the track comes on the south, on the engineer's side, and he could have seen better from his cab than he could from the side-track.

I submit that a fair consideration of this evidence leads to the conclusion that, if true, the engineer could have seen and heard.

(3) If so, the remaining inquiry is: Could he have seen and heard in time to stop the train and avoid killing the deceased, or, rather, is there evidence of this fact? This involves an investigation of the evidence as to the distance the train moved after the deceased fell, the speed of the train, and the distance within which it could be stopped.

(a) How far did the train move after the deceased fell?

C. H. Perry testified:

Q. After he fell, how far did your train go? A. It seemed to me that it went but a little piece; could not say exactly how far.

Q. Give your best judgment as to how far it went? A. It went, it seemed to me, probably a car length.

Q. That is your best judgment of it? A. Yes, at the time.

Q. When he fell, what did you see him doing on the track? A. It looked like he was just scrambling along. I don't know whether his feet were fastened or whether he was just trying to keep out of the front of the car.

Q. And it looked like he was trying to keep out of the way of the wheels? A. Yes.

Q. Well, just state how he was? A. The best I could see, it just looked like he was trying to keep out of the way of the wheel.

Q. How far did the car go under those circumstances—you say it went a car length? A. I could not say; it might have been more than that.

Q. That is your judgment, that it went about a car length while he was in that situation? A. Yes, something like that.

It is conceded that a car length is about 30 feet.

(b) What was the speed of the train? Dock Bryson and C. H. Perry say it was going about "as fast as a man could walk"; J. R. Warren, "3 or 4 miles an hour"; D. C. Ensley, "3 miles an hour."

A. L. Roberts says when he started in the siding he was running from "4 to 6 miles an hour," and he was then asked:

Q. You mean to tell the jury that when you started to back in there it was going 4 to 6 miles an hour? A. Yes; but when he fell off it might not have been going 2 miles an hour.

(c) Within what distance could the train have been stopped? S. L. Cabe testified: "Within 4 feet."

A. L. Roberts testified on cross-examination:

Q. You say if the train had been going from 4 to 6 miles an hour, you could have stopped in 8 or 10 feet, so that you could stop the train going at 2 miles an hour in what distance? A. In the slack of the car.

Q. How much slack is there in a car? A. There was 2 feet slack in the cars that were coupled together.

Q. How much slack was there in this car? A. Six or 8, maybe 10 inches.

Q. And you could stop that one car in 6 inches? A. In 10 or 12 inches.

Q. And the others might have rolled on a little further? A. (No answer.) And on redirect examination:

Q. You say you could stop a train going 2 miles an hour in 10 inches; do you mean with or without slack? A. Without the slack of the cars. With the slack of the cars, it would have taken longer.

Q. If that train was going back in there at 2 miles an hour with the slack in, in how far could you stop it? A. In about 8 feet.

There is therefore evidence that the train ran 30 feet after the deceased fell; that he fell within 60 feet of the engine and in the direction the engineer was required to look; that he began crying out as he fell; that he was heard 65 yards distant; that his head was 2 feet beyond the rail and he was grabbing at the end of the cross-ties; that the car between him and the engine projected over the rail 14 inches; that the train was running at from 2 to 4 miles an hour, and therefore making little noise; that the train could have been stopped in 4 feet at least, and one witness, who was not present but was familiar with the location and trains, swore the engineer could have seen the deceased.

If the car ran 30 feet and he had seen or heard the deceased as he fell, and had stopped his car in 28 feet, when, according to the evidence, it could have been stopped in 4, a life would have been saved.

I agree with the principle laid down by the Court, that it is the duty of the Superior Court judge to decide whether there is evidence, and of this Court upon appeal to review this decision; but we cannot go further.

We cannot weigh the evidence and pass on its sufficiency, and if we do undertake to do so, we usurp the powers of the jury. The duty imposed is well stated by *Justice Hoke* in *Fitzgerald v. R. R.*, 141 N. C., 534. He says: "It is very generally held that direct evidence of negligence is not required, but the same may be inferred from facts and attendant circumstances, and it is well established that if the facts proved establish the more reasonable probability that the defendant has been guilty of actional negligence, the case cannot be withdrawn from the jury, though the possibility of accident may arise on the evidence. Thus, in Shearman and Redfield on Negligence, sec. 58, it is said: 'The plaintiff is not bound to prove more than enough to raise a fair presumption of negligence on the part of the defendant and of resulting injury to himself. Having done this, he is entitled to recover unless the defendant produces evidence

to rebut the presumption. It has sometimes been held not sufficient for the plaintiff to establish a probability of the defendant's default; but this is going too far. If the facts proved render it probable that the defendant violated its duty, it is for the jury to decide whether it did so or not. To hold otherwise would be to deny the value of circumstantial evidence.' "

I was interested in the eloquent plea of counsel for the plaintiff in behalf of trial by jury, in the course of which he said it was reported that King Alfred, in the olden days, had caused forty-four of the judges to be executed because of their denial of this right to the subject. I would suggest to him that the incident is violative of the principle he advocates, as there is no suggestion that the king gave the judges a trial by jury.

I repeat that I do not know how the fact is, nor I do know what I would do as a juror, but in my opinion there is evidence fit to be submitted to a jury.

CLARK, C. J., concurring in the dissenting opinion of ALLEN, J. When the train was moving rear-foremost into the siding, that is, backing into it, it was the duty of the engineer to look out of the cab window in the direction in which the train was moving. If he did not do so, and thereby failed to hear the outcries or see the struggles of the deceased brakeman in trying to save himself, it was clearly negligence. The engineer was in charge of the train, and it was his duty to keep supervision over it. It is true that the engineer testifies, in his own behalf, that he did keep a lookout by leaning out of the window and looking in the direction in which the train was moving. But he may have been mistaken as to this. The nonsuit takes for granted that his statement was true; but if the statement had been submitted to the jury there was evidence from which they might have found the contrary. The fact that people standing some distance off heard the agonized scream of the victim, while the engineer, little more than a car length away, says that he did not, would indicate that he was not leaning out the cab window. Besides, how far the head and hands of a man in the position of the deceased should have been seen by one

leaning out of the cab window, which would put the engineer considerably beyond the edge of the ties, was a matter for the jury. These and other potent circumstances mentioned in the able dissenting opinion of *Mr. Justice Allen,* which need not be repeated here, would seem to make it clear that this case should have been submitted to the jury.

The old landmark was, that if there is "any evidence beyond a *scintilla*" a party was entitled to have the case submitted to a jury, as guaranteed by the Constitution. The departure was made in *Wittkowsky v. Wasson,* 71 N. C., 451, in which *Judge Bynum* filed his admirable dissenting opinion which is a classic. From that day to this, the power of the judges to take cases from the jury has been steadily extended, till now it can almost be said that trial judges are tempted to think it is not incumbent upon them to give the plaintiff, especially in negligence cases, the right to a trial by jury unless the judge is of an opinion that the evidence will "reasonably" justify a verdict for the plaintiff. That is, the judge puts himself in the place of the jury. The distinguished counsel of the plaintiff in this case recalled to our attention that Alfred the Great is said by some writers to have hung forty-four judges for denying this right to trial by jury. The incident is doubtless mythical, for trial by jury was not known till many centuries later, if we take the best authorities. But if the tendency to cut short trials by depriving parties of the right to have controversies settled by jury is not very much restricted it will inevitably result in legislation that will deprive judges of that power, and probably go much further than it should. We have instances before us of such results.

At common law, the judges were not forbidden to express an opinion upon the facts. In fact, this right was very useful in practice as an aid to the jury, and the judges still possess such power in the Federal courts and in many of our sister States as well as in England. But by reason of some excuse, as it was thought, in this State the judges were absolutely deprived of that power by the Act of 1796, now Rev., 535, with the result that the slightest expression of an opinion on the facts, by a judge in the course of a trial, however impartial or help-

ful it might be to the jury, is now ground for a new trial. Again, it was the right of the judges to prescribe the number and length of the speeches of counsel, as it still is in the Federal courts and in most of the State courts and in England. But by reason of what was thought to be an abuse of this power by the judges it was absolutely taken away by statute, with a great increase of the length of trials and expense to the public. Rev., 216, has somewhat restored the former power of the judges in this respect, but not to the full extent.

By reason of the holding of this Court in *Owens v. R. R.,* 88 N. C., 502, that the burden was upon the plaintiff to negative contributory negligence *(Ruffin, J.,* dissenting), the General Assembly promptly passed the Act of 1887, now Rev., 483, which requires that the defense of contributory negligence "shall be set up in the answer and proved on the trial." In *Neal v. R. R.,* 126 N. C., 634, this Court by a bare majority decided that the judge could hold as a matter of law, upon the demurrer to the evidence of the plaintiff, that contributory negligence was proven. Without repeating what was said in the dissenting opinions in that and subsequent cases, it is sufficient to say that the doctrine of *Neal v. R. R.* has been extended until in the opinion of many good lawyers the beneficial intent of the Legislature in enacting Rev., 483, has been largely denied to the plaintiff in many cases.

The extent to which the courts are assuming, on motions for nonsuit, to judge of the "sufficiency of the evidence," and, as to the defense of contributory negligence, the tendency to hold as a matter of law that the plaintiff is guilty of contributory negligence, notwithstanding the statute put that burden upon the defendant and clearly meant that whether it was "proven" or not was a fact to be determined by the jury, are to be deplored.

Without questioning in the slightest degree the right of the majority of the Court to express their own views, I deem it my duty, as well as my right, to dissent earnestly against this claim of power on the part of the. Court. Men conscious of their own rectitude are especially prone to believe their own judgment correct, and judges are no exception. But under our

LEE *v.* INSURANCE CO.

Constitution parties to litigation have a right to have jurors and not judges pass upon the evidence, however slight, when beyond a mere scintilla. They can challenge jurors who are to pass upon the facts, but cannot except to a judge who feels competent to pass upon the facts in holding that the evidence is not sufficient to justify a verdict for the plaintiff.

In the late decision of the United States Supreme Court in the *Standard Oil case* that Court assumed to write into an act of Congress the word "reasonable," as *Mr. Justice Harlan* so clearly pointed out in his dissenting opinion. The majority of that Court were doubtless sincere, but they attributed to their own intelligence, powers which under the Constitution were vested in Congress. They doubtless believed that the Court had "the last say." But the Constitution, from which they derive their powers, Art. III, sec. 2, clause 2, gives that Court jurisdiction, "with such exceptions, and under such regulations, as the Congress shall make." The courts have not even the "last say" in respect to the Executive, for when *Chief Justice Marshall* rendered a decision which the President deemed unsound he declined to obey it, and the decision has never been executed to this day.

Not concurring in the views of the majority of the Court, it is not improper to call attention to some of the instances in which, in this State, the Legislature has dissented from this tendency in the courts to substitute their own judgment as to the extent of their powers by terming it a matter of law. In some instances the Legislature has probably gone too far in the opposite direction, as was perhaps a natural consequence.